This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.                                                                                  **NO. 32,612**

**MIRANDA B. KUYKENDALL,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF LEA COUNTY**
**J. Richard Brown, District Judge**

Gary K. King, Attorney General
Yvonne M. Chicoine, Assistant Attorney General
Santa Fe, NM

for Appellee

Jorge A. Alvarado, Chief Public Defender
Mary Barket, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**MEMORANDUM OPINION**

**VANZI, Judge.**

{1}     Defendant Miranda Kuykendall was convicted of negligently permitting child abuse resulting in the death of her son B.K. and negligently permitting child abuse not resulting in the death or great bodily harm of her son T.C., contrary to NMSA 1978, Section 30-6-1(D) (2009). Defendant appeals her conviction as to B.K. on various grounds. She also appeals the district court's determination that the convictions are "serious violent offenses" for the purposes of the Earned Meritorious Deductions Act (EMDA), NMSA 1978, § 33-2-34 (2006). We affirm Defendant's conviction as to B.K. because we conclude that (1) sufficient evidence supports her conviction, (2) the jury was properly instructed, (3) expert scientific testimony regarding B.K.'s autopsy and chemical blood testing results did not violate Defendant's confrontation rights, and (4) a clerical error on the verdict form submitted to the jury does not constitute reversible error. However, we hold that the district court erred by not making sufficient factual findings to support its decision that Defendant's convictions are serious violent offenses under the EMDA. We therefore reverse the district court's serious violent offense designation and remand for the district court to consider the evidence and enter appropriate findings. On remand, we also direct the district court to correct a clerical error on Defendant's judgment and sentence.

**BACKGROUND**

{2} On the evening of May 6, 2010, Defendant left her nearly four-year-old son, T.C., and her twenty-two-month-old son, B.K., in the care of her boyfriend, Chris Elliot, while she worked a night shift at Hobbs Healthcare. At approximately 6:00 a.m. the next morning, Elliot called his father's girlfriend, Lacresha Montgomery, "in a panic" and told her to come to the house. When Montgomery arrived, Elliot placed B.K. in the front seat of her truck and told her to take the child to the hospital. B.K. was burned and bruised and was "ice cold" to the touch. Montgomery called 911 on the way to the hospital. B.K. was pronounced dead at the scene. His manner of death was later determined to be homicide resulting from multiple blunt force trauma, and he had thermal injuries on his genitals, buttocks, lower abdomen, face, and legs. In addition, B.K.'s blood tested positive for alcohol, a level of methamphetamine sixty times higher than the therapeutic dose for an adult, and amphetamine. When police officers found T.C., he had bruises and other injuries on his face, forehead, ear, neck, arms, chest, back, pelvis, and buttocks. Elliot ultimately pleaded guilty for crimes related to the death of B.K. and the abuse of T.C.

{3} The State charged Defendant with two crimes: intentional or negligent child abuse resulting in death as to B.K., and intentional or negligent child abuse not resulting in death or great bodily harm as to T.C. Prior to trial, the State announced it was only proceeding on a theory of negligent child abuse. The State introduced the

3

following evidence at trial. Defendant began dating Elliot in September 2009. Defendant's brother, who was living with the couple at the time, noticed bruises on both children. Defendant's mother also noticed bruises on the children during the time that Defendant was living with Elliot. She testified that she told Defendant about these bruises. In April 2010, Defendant, Elliot, and the children moved into their own house, and Defendant testified that Elliot became "a lot more aggressive" both with her and with the children. During this time, Elliot's father, who frequently visited Defendant, Elliot, and the children with Montgomery, testified that he saw bruises on T.C. and knew that T.C. was being abused.

{4} Several weeks before B.K. died, when Defendant returned from work, Elliot showed her "huge" bruises on B.K. Elliot claimed he had tripped over B.K. and some tools left on the floor at the house but also admitted that some of the bruises were from spanking B.K. too hard. Defendant testified that she doubted Elliot's explanation. She voiced her concerns to Montgomery several days later and told Montgomery she knew Elliot was abusing B.K. when she was at work because B.K. had new bruises every time she came home. According to Montgomery, Defendant said she needed to save money so she could leave Elliot and get her children away from him before B.K. ended up dead. After the above incident, and because of Defendant's fears, Montgomery and Elliot's father let B.K. stay with them for several days until

Defendant asked them to bring him back. Although Defendant claims she did not know the extent of B.K.'s injuries, Elliot's father testified that when he saw B.K., it looked like he had been used as "a punching bag," and Montgomery said B.K. was bruised "from head to toe." In a letter she later wrote to B.K.'s father, Defendant acknowledged that she knew Elliot was abusing the children and that both boys would cry whenever she left to go to work. The evidence also established that Elliot was both using and dealing methamphetamine out of their house. In addition, before Defendant left for work on May 6, 2010, Elliot became so incensed that he shattered a glass against the wall. Defendant's defense consisted primarily of her own testimony. She also presented evidence about the barriers domestic violence raises to prevent a victim from leaving.

{5}     A jury convicted Defendant of both crimes. The district court mitigated Defendant's sentences by one-third and ran them concurrently. However, it found that both offenses were serious violent offenses under the EMDA. This appeal followed. Additional facts are provided as pertinent to our discussion of the issues.

**DISCUSSION**

{6}     Defendant makes five claims of error: (1) that her conviction for negligent child abuse resulting in the death of B.K. was not supported by sufficient evidence, (2) that the jury was not properly instructed, (3) that the expert scientific testimony concerning

5

B.K.'s autopsy and chemical blood testing results violated her confrontation rights, (4) that a clerical error on the verdict form constituted reversible error, and (5) that the district court wrongly designated her child abuse convictions "serious violent offenses" under the EMDA. We address each issue in turn.

**Sufficiency of the Evidence as to Count I**

{7}    Defendant first contends the evidence was not sufficient to sustain her conviction for negligently permitting child abuse resulting in the death or great bodily harm of B.K. "In reviewing the sufficiency of the evidence, we must view the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Cunningham*, 2000-NMSC-009, ¶ 26, 128 N.M. 711, 998 P.2d 176. We then determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (emphasis, internal quotation marks, and citation omitted). We do not second guess the jury concerning witness credibility, the weight of the evidence, or their judgment. *State v. Garcia*, 2011-NMSC-003, ¶ 5, 149 N.M. 185, 246 P.3d 1057.

{8}    We turn to the jury instructions for the elements of the crime. *See State v. Smith*, 1986-NMCA-089, ¶ 7, 104 N.M. 729, 726 P.2d 883 ("Jury instructions become the

law of the case against which the sufficiency of the evidence is to be measured."). In the present case, the jury was instructed that, to find Defendant guilty of negligently permitting child abuse resulting in death or great bodily harm as charged in Count I, the State had to prove the following elements beyond a reasonable doubt:

1. [Defendant] permitted [B.K.] to be placed in a situation which endangered [his] life or health . . . ;

2. [D]efendant acted with reckless disregard and without justification. To find that [Defendant] acted with reckless disregard, you must find that [Defendant] knew or should have known [D]efendant's actions or failure to act created a substantial and foreseeable risk, [D]efendant disregarded that risk and [D]efendant was wholly indifferent to the consequences of the conduct and to the welfare and safety of [B.K.]

. . . .

4. [Defendant's] actions or failure to act resulted in the death of [B.K.]

Defendant argues only that there was insufficient evidence to show she disregarded a "substantial and foreseeable risk" of B.K.'s death or great bodily harm. Defendant concedes that the evidence indicated Elliot had previously abused the children. However, she contends it also showed that several weeks prior to B.K.'s death, she "had taken steps to end that abuse," that Elliot had since been abiding by her request to not discipline the children, that "the children seemed happy and fine on the evening of May 6," that Elliot "was not intoxicated or outwardly hostile towards the children

7

that night, and that the prior instances of abuse had mostly resulted in bruises with the exception of B.K.'s broken ribs[,]" an injury Defendant claims she was not aware of. Her basic premise appears to be that, although she knew or suspected Elliot abused B.K., she did not know the abuse would result in Elliot killing B.K. when she went to work on the evening of May 6, and, therefore, she should not be held accountable for permitting the child abuse that resulted in his death. We are not persuaded.

{9}     The language "substantial and foreseeable risk" is used in UJI 14-602 NMRA to define "reckless disregard," which in turn is a part of the definition for criminal negligence in the child abuse statute, Section 30-6-1(A)(3). In *State v. Chavez*, our Supreme Court identified several factors to be considered in determining whether a defendant's conduct created a substantial and foreseeable risk to a child. 2009-NMSC-035, ¶ 45, 146 N.M. 434, 211 P.3d 891. Those factors are "the gravity of the threatened harm, whether the defendant's underlying conduct violates a separate criminal statute, and the likelihood that harm will occur." *State v. Vasquez*, 2010-NMCA-041, ¶ 17, 148 N.M. 202, 232 P.3d 438 (internal quotation marks and citation omitted). Of these, the gravity of the risk is the determinative factor because it "serves to place an individual on notice that his [or her] conduct is perilous, and potentially criminal, thereby satisfying due process concerns." *Id.* (alteration in original) (internal quotation marks and citation omitted).

{10}     Here, the evidence at trial established that Elliot had previously abused B.K., that he admitted to spanking B.K. too hard a few weeks before B.K.'s death, and that the result of that spanking left B.K. covered in bruises "from head to toe." It also confirmed that Elliot both used and dealt methamphetamine out of the house. Further, Defendant admitted she was aware Elliot abused B.K. in the weeks and months before his death and that Elliot himself informed her of the abuse he inflicted several weeks before B.K.'s death, during which time it appeared that B.K. had been used as "a punching bag." The evidence also demonstrated that Defendant recognized—and verbalized to Montgomery—the gravity of the risk Elliot posed to her children, including that the abuse could be fatal to B.K. Even taking into account Defendant's view of the time leading up to B.K.'s death, viewing the evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact could easily find that Defendant understood the grave risk inherent in leaving her twenty-two-month-old child with her chronically abusive, drug-using boyfriend, and that she recklessly disregarded that risk by leaving B.K. with Elliot. *See id.* ¶ 24 (holding that sufficient evidence supported the defendant's conviction for criminally negligent child abuse where the defendant was aware of only one prior instance of abuse but still left her child with the abuser, and the child died while under his care). Defendant's conviction for Count I was supported by sufficient evidence.

9

**Jury Instructions**

{11}     Defendant argues that three separate errors concerning the jury instructions require retrial in this case. "When considering a defendant's requested instructions, we view the evidence in the light most favorable to the giving of the requested instruction." *State v. Romero*, 2005-NMCA-060, ¶ 8, 137 N.M. 456, 112 P.3d 1113. Our review is de novo. *Id.*

{12}     Defendant first argues the district court erred in refusing her request for a lesser included instruction on abandonment resulting in death or great bodily harm for Count I. The district court refused to give an abandonment instruction because it found that, based on the definition of the crimes, child abandonment was a separate offense, not a lesser included offense of negligent child abuse. It further found that no facts presented at trial supported Defendant's theory of abandonment because there was no evidence of "neglect" as that term is defined in the child abandonment statute.

{13}     A defendant is entitled to a lesser included offense instruction when "(1) the lesser offense is included in the greater, charged offense; (2) there is evidence tending to establish the lesser included offense and that evidence establishes that the lesser offense is the highest degree of crime committed; and (3) the defendant has tendered appropriate instructions preserving the issue." *State v. Jernigan*, 2006-NMSC-003, ¶ 21, 139 N.M. 1, 127 P.3d 537. Without elaboration, Defendant argues that the jury

should have been instructed on abandonment as a lesser included offense because the State accused her of *leaving* B.K. in a dangerous situation with Elliot "without sufficient oversight." The State, on the other hand, contends that Defendant failed to satisfy any of *Jernigan*'s three conditions. Although we conclude that Defendant adequately preserved this issue for review on appeal, we otherwise agree with the State.

{14}    We briefly address the preservation issue first. While Rule 5-608(D) NMRA provides that a correct written instruction must be tendered in order to preserve an error for failure to instruct on any issue, our Supreme Court has stated that this rule is "subject to flexible enforcement that is consistent with its underlying rationale." *State v. Skippings*, 2011-NMSC-021, ¶ 25, 150 N.M. 216, 258 P.3d 1008. The purpose of the rule is to "alert the trial court to the defendant's argument." *Id.* (internal quotation marks and citation omitted).

{15}    Here, although Defendant did not submit the elements instruction for abandonment resulting in great bodily harm or death as set forth in UJI 14-606, she submitted step-down instructions and verdict forms for abandonment. Further, both parties argued about the propriety of an abandonment instruction, and the district court expressly denied Defendant's request for such an instruction at trial. Under the circumstances, the purpose of the rule was met and, under the third prong of *Jernigan*,

11

Defendant adequately preserved her argument for appellate review. *See* 2006-NMSC-003, ¶ 21.

**{16}**    As we have noted, the definition of abuse of a child is set out in Section 30-6-1(D) as "consist[ing] of a person knowingly, intentionally or negligently, and without justifiable cause, causing or permitting a child to be" placed in a dangerous situation, tortured, or exposed to the weather. Section 30-6-1(A)(3) defines "negligently" as "refer[ring] to criminal negligence and means that a person knew or should have known of the danger involved and acted with a reckless disregard for the safety or health of the child." *See* UJI 14-605. "Abandonment of a child consists of [a] parent . . . intentionally leaving or abandoning the child under circumstances whereby the child may or does suffer neglect." Section 30-6-1(B). A comparison of the above statutory elements reveals that each offense contains an element that the other does not: the mens rea element. To prove abandonment, the state must show that the defendant intended to commit the wrongful act or the consequence. UJI 14-606. In other words, a person acts "intentionally" when she purposely does an act. UJI 14-610. Negligently permitting child abuse, on the other hand, requires proof that the defendant acted with reckless disregard: (1) the defendant knew or should have known that his or her conduct created a substantial and foreseeable risk, and (2) the defendant recklessly disregarded and was wholly indifferent to the consequences of his or her

12

conduct and to the welfare and safety of the child. UJI 14-605. Since each crime requires proof of a different element, we find there is a presumption that the Legislature intended to punish these crimes separately. *See State v. Sanchez*, 2000-NMSC-021, ¶ 33, 129 N.M. 284, 6 P.3d 486 (stating, in the context of double jeopardy analysis, that "[w]hen the elements of the statutes are not subsumed within the other, there is a presumption that the statutes punish distinct offenses"). Defendant has provided no evidence of any contrary legislative intent. Accordingly, we affirm the district court's decision denying Defendant's request for the jury to be instructed on abandonment of a child as a lesser offense.

{17} Defendant makes two additional arguments related to the instructions given at trial. Because she did not preserve either argument, we review both claims for fundamental error. *See State v. Boeglin*, 1987-NMSC-002, ¶ 11, 105 N.M. 247, 731 P.2d 943 (explaining that, where a defendant fails to preserve an objection to jury instructions at trial, the court may only grant relief in cases of fundamental error). "Fundamental error only applies in exceptional circumstances when guilt is so doubtful that it would shock the judicial conscience to allow the conviction to stand." *State v. Baca*, 1997-NMSC-045, ¶ 41, 124 N.M. 55, 946 P.2d 1066, *overruled on other grounds by State v. Belanger*, 2009-NMSC-025, 146 N.M. 357, 210 P.3d 783.

13

The burden of demonstrating fundamental error is on the party alleging it. *Cunningham*, 2000-NMSC-009, ¶ 21.

{18} Defendant first contends the jury should have been given a lesser included instruction for child abuse not resulting in great bodily harm for Count I because "the jury could have found that [she] disregarded a foreseeable risk of abuse not resulting in great bodily harm, but did not disregard a foreseeable risk of death or great bodily harm." However, Defendant fails to argue, much less establish, how this hindsight-driven speculation constitutes fundamental error, and we see none. *See State v. Villa*, 2004-NMSC-031, ¶ 16, 136 N.M. 367, 98 P.3d 1017 (concluding that there was no fundamental error where the state made a strategic decision not to request lesser included offense instructions at trial and its strategy did not prevail).

{19} Defendant also asserts that the instruction given for Count I, which is the uniform jury instruction for negligently permitting child abuse, is erroneous because the definition of "reckless disregard" provided in that instruction does not sufficiently inform jurors what the mens rea for the crime is. Our task in reviewing for fundamental error is to determine "whether a reasonable juror would have been confused or misdirected by the jury instruction." *State v. Benally*, 2001-NMSC-033, ¶ 12, 131 N.M. 258, 34 P.3d 1134 (internal quotation marks and citation omitted). "[J]uror confusion or misdirection may stem . . . from instructions which, through

14

omission or misstatement, fail to provide the juror with an accurate rendition of the relevant law." *Id.*

{20} Citing *Chavez*, Defendant contends that the jury should have been explicitly instructed "that the magnitude of the risk of the resulting harm occurring is an aspect of whether the risk of harm was 'substantial and foreseeable,' " and specifically that the "resulting harm" informs whether the risk Defendant disregarded was substantial and foreseeable. 2009-NMSC-035, ¶ 23. To the extent Defendant argues that the magnitude of the *harm* the child actually incurs is determinative, she misconstrues *Chavez*. That case makes clear that it is the magnitude of the *risk* of harm to which the defendant exposes the child that guides our analysis. *Id.* ¶ 15. Defendant also overlooks that *Chavez* cited favorably to the same mens rea standard about which she complains. *Id.* ¶ 22. Specifically, our Supreme Court noted that, to find the accused acted with the requisite mens rea, the jury is instructed that it must find that the "defendant's conduct created a *substantial and foreseeable risk* of harm," and that the instruction "aligns with the legislative purpose that animates the child endangerment statute—to punish conduct that creates a truly significant risk of serious harm to children." *Id.* ¶ 22 (internal quotation marks and citations omitted). Based on the evidence, the risk that Elliot would abuse the children was both foreseeable and

15

substantial to Defendant. We conclude that the jury in this case was properly instructed.[1]

**Confrontation Clause and Expert Scientific Testimony**

{21}     Defendant makes two arguments regarding the expert testimony admitted in this case, both of which she contends are violations of her right to confrontation. "Under the Confrontation Clause, out-of-court testimonial hearsay is barred unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness." *State v. Cabezuela*, 2011-NMSC-041, ¶ 49, 150 N.M. 654, 265 P.3d 705 (alterations, internal quotation marks, and citation omitted). This Court reviews issues of admissibility under the Confrontation Clause de novo. *State v. Gurule*, 2013-NMSC-025, ¶ 33, 303 P.3d 838.

---

[1]We recognize that our Supreme Court has questioned the validity of the uniform jury instruction on negligent child abuse, most recently in *State v. Consaul*, 2014-NMSC-___, ¶¶ 27-40, ___ P.3d ___ (No. 33,483, Aug. 21, 2014), which was filed after the parties submitted their briefs. Our Supreme Court's concern is that the instruction could lead jurors to wrongfully convict defendants based on a civil negligence as opposed to a criminal negligence standard. *Id.* ¶¶ 28, 39. In *Consaul*, our Supreme Court particularly took to task the "knew or should have known" language in the uniform jury instruction, noting how that language appears to reflect a civil negligence standard and discussing how it might be at odds with the "reckless disregard" standard that is the hallmark of criminal negligence. *Id.* ¶ 35. Because that case pertains to a different part of the uniform jury instruction than that challenged by Defendant, it does not bear on our holding here.

16

{22}     Defendant first contends that forensic toxicologist Dr. Hwang's testimony about B.K.'s toxicology results violated her confrontation rights because Dr. Hwang did not physically perform or oversee the testing of B.K.'s blood. In *State v. Huettl*, this Court addressed the admissibility of scientific expert testimony regarding chemical results proffered by an expert who did not physically conduct the testing in light of the *Bullcoming v. New Mexico*, ___ U.S. ___, 131 S. Ct. 2705 (2011), decision and its progeny. *See State v. Huettl*, 2013-NMCA-038, ¶¶ 35-38, 305 P.3d 956, *cert. quashed*, 2014-NMCERT-005, 326 P.3d 1112. We explained that an expert's scientific testimony is permissible when it is "based upon facts or data of which the expert has been made aware, even when those facts or data would otherwise be inadmissible, provided that the expert testifies only to his or her own, independently derived conclusions." *Id.* ¶ 35. Put differently, "an expert who has analyzed the raw data generated by another analyst and who has formed independent conclusions based upon that analysis may testify as to those conclusions." *Id.* ¶ 36. In contrast, expert testimony is impermissible when it is "based solely upon a non-testifying analyst's analysis and conclusions." *Id.* ¶ 37. In those instances "the expert will have failed to form an independent opinion and is merely acting as a conduit for the presentation of a non-testifying witness's testimonial hearsay." *Id.* ¶ 38.

{23} In this case, Dr. Hwang testified that he independently reviewed data to come up with the blood alcohol content, reviewed the graph rendered from the gas chromatograph mass spectrometer to determine the presence of methamphetamine, and did an independent review of the drug screening. Defendant cites no evidence suggesting Dr. Hwang relied on prepared reports containing analyses of the results of the chemical tests that were performed. *Cf. State v. Sisneros*, 2013-NMSC-049, ¶ 31, 314 P.3d 665 (holding that a confrontation violation occurred where a substitute pathologist used a diagram prepared by the autopsy pathologist to demonstrate bullet trajectory instead of relying on raw data to express her independent opinion); *Bullcoming*, ___ U.S. at ___, 131 S. Ct. at 2708 (holding that the admission of laboratory report of a non-testifying analyst containing the defendant's blood alcohol content violated the defendant's confrontation right, and rejecting the "surrogate testimony" of an analysis who did not participate in or observe the testing of the blood and who had no independent opinion about the defendant's blood alcohol content); *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 308, 310-11 (2009) (holding that admission of "certificates of analysis" from a state forensic laboratory, which stated that a substance seized from the defendant was cocaine, violated the defendant's confrontation right). We conclude that, although Dr. Hwang did not perform the

18

chemical testing himself, his testimony was based on a scientific technique that produces raw data and was therefore admissible.

{24} Defendant also claims Dr. Hwang testified "about how the procedures are normally done, tacitly suggesting to the jury that these procedures were followed in this case," and that she was not able to test this assertion because the persons who performed the tests did not testify. We disagree. First, Defendant cites no testimony in which Dr. Hwang claims the persons who physically conducted the chemical testing certified the procedures they followed or their results, and no such certification was entered into evidence. *See Huettl*, 2013-NMCA-038, ¶ 28 (noting that cases from the United States Supreme Court "do not support the notion that a defendant has the right to confront a laboratory analyst who, having participated in some aspect of evidence analysis, nevertheless did not record any certifications, statements, or conclusions that were offered as evidence"). In addition, Defendant did not challenge whether the proper procedures were actually followed in B.K.'s case by cross-examining Dr. Hwang regarding his lack of personal knowledge about how the lab work was done. Consequently, there was no violation of Defendant's confrontation rights with regard to Dr. Hwang's testimony.

{25} Defendant also contends that her confrontation rights were violated when Dr. Ian Paul, the supervising forensic pathologist at the Office of the Medical Investigator

19

(OMI) on the day of B.K.'s autopsy, testified about the autopsy results instead of Dr. Alice Briones, the forensic pathology fellow who physically performed the autopsy. In *Cabezuela*, our Supreme Court analyzed a similar issue, where the supervising pathologist testified in lieu of the pathologist who physically performed the autopsy. 2011-NMSC-041, ¶¶ 48-52. The supervising pathologist in that case testified that she independently participated in the microscopic exam, examination of the body and injuries, and examination of all the photographs, and she signed the autopsy report. *Id.* ¶ 50. Under those facts, our Supreme Court noted that the defendant had a full and fair opportunity to cross-examine the supervising pathologist to determine whether she had personal, first-hand knowledge of: (1) how the pathologist who performed the autopsy did so, (2) what that pathologist found, and (3) what the supervisor concluded based on the raw data. *Id.* ¶ 52. Because the defendant did not undertake such an examination, our Supreme Court concluded that a record lacking this cross-examination supported a reasonable inference that the supervising forensic pathologist had personal knowledge of and participated in making the autopsy report findings. *Id.* Thus, there was no confrontation issue. *Id.*

{26}    Defendant challenges Dr. Paul's personal involvement in the autopsy solely by asserting that Detective Helton, who was present at B.K.'s autopsy, testified that he only recalled seeing a female pathologist in the room during the autopsy. However,

Dr. Paul testified that in his role as the supervising pathologist, he is generally present in the room while an autopsy is being performed, reviews all of the autopsy findings, reviews all slides looked at under the microscope, edits and finalizes the final autopsy report, makes any changes he sees fit, and is ultimately responsible for the report, even when he did not perform the physical autopsy or dissection of organs. Moreover, he testified that, as the supervising pathologist on the day of B.K.'s autopsy, he followed this procedure, and both he and Dr. Briones signed the autopsy report. As in *Cabezuela*, nothing prevented Defendant from cross-examining Dr. Paul about his actual level of independent participation in the process. Moreover, Defendant cites no testimony that leads us to conclude Dr. Paul's level of personal participation was insufficient for confrontation purposes. Accordingly, the record before us supports a reasonable inference that Dr. Paul had personal knowledge of and participated in making the autopsy report findings, and his testimony did not violate Defendant's rights under the confrontation clause.

**Clerical Error on Jury Verdict Form**

{27}    Defendant contends that the district court committed reversible error by submitting and accepting a written verdict form for intentional child abuse instead of for negligent child abuse for Count I. Neither party knows how the wrong verdict

form got submitted to the jury, and it is undisputed that the error on the verdict form was clerical.

{28} "It is well settled that if there is any doubt about a verdict [the appellate courts are] entitled to interpret the verdict by reference to the whole record and particularly by reference to the instructions given by the lower court." *State v. Reed*, 1951-NMSC-021, ¶ 22, 55 N.M. 231, 230 P.2d 966. In this analysis, "[v]erdicts should be liberally construed and all fair intendments should be made to sustain them. A verdict should be rejected only when it is either ambiguous, incomplete or unresponsive to the issue or issues submitted by the court." *State v. Tijerina*, 1972-NMCA-169, ¶ 21, 84 N.M. 432, 504 P.2d 642. Our goal is to discern the jury's intention. *See Reed*, 1951-NMSC-021, ¶ 22.

{29} Here, the jury was instructed only on negligently permitting child abuse resulting in death or great bodily harm for Count I. It was not given any instruction on intentional child abuse. Further, the only mention of intentional child abuse was on the erroneous form that was submitted to the jury. That form was the only verdict form submitted for Count I. Under these circumstances—where there was only one instruction and only one verdict form for Count I, and the jury was instructed only on the crime for which Defendant was tried—we believe there is sufficient indicia that the jury intended to convict Defendant of the charge in Count I. We further note that

"[n]o irregularity in the recording of a verdict shall affect its validity unless the defendant was in fact prejudiced by such irregularity." Rule 5-611(F) NMRA. The verdict form the jury signed was for a crime carrying both a higher mens rea requirement and a greater punishment than the crime for which they were instructed. *Compare* § 30-6-1(F) (negligent child abuse), *with* § 30-6-1(G), (H) (intentional child abuse). We presume that juries follow the instructions they are given. *State v. Smith*, 2001-NMSC-004, ¶ 40, 130 N.M. 117, 19 P.3d 254.

**The District Court's Designation of the Crimes as "Serious Violent Offenses" Under the EMDA**

{30}    Lastly, Defendant contends that the district court erred in determining that the negligently permitting child abuse convictions were serious violent offenses for the purposes of the EMDA. Defendant argues both that the district court's findings were legally inadequate under the EMDA to establish she committed serious violent offenses, and that the findings the district court made during the mitigation stage of her sentencing require a finding that the offenses were not serious violent offenses. We review the district court's designation of a crime as a serious violent offense for an abuse of discretion. *State v. Solano*, 2009-NMCA-098, ¶ 7, 146 N.M. 831, 215 P.3d 769. However, because a court abuses its discretion when it acts contrary to law, we review de novo the legal sufficiency of the district court's findings in support of its serious violent offense designation. *Id.* If we determine the district court's findings

23

are legally sufficient, we then turn to consider whether those findings are supported by substantial evidence. *State v. Scurry*, 2007-NMCA-064, ¶ 4, 141 N.M. 591, 158 P.3d 1034.

{31} The EMDA provides that prisoners convicted of serious violent offenses may earn only four days a month of credit against their time in prison for participating in certain programs, while prisoners convicted of nonviolent offenses may earn up to thirty days a month. Section 33-2-34(A)(1), (2). The statute contains a list of offenses that are considered per se serious violent offenses. Section 33-2-34(L)(4)(a)-(n). It also contains a list of offenses that we refer to as "discretionary offenses" that may be designated as serious violent offenses at the discretion of the sentencing court. Section 33-2-34(L)(4)(o); *Solano*, 2009-NMCA-098, ¶ 23. Child abuse is a discretionary offense under the EMDA. Section 33-2-34(L)(4)(o).

{32} Although a district court has the authority to deem the discretionary offenses serious violent offenses, it may do so only when it finds that the "nature of the offense and the resulting harm" warrants such a finding. Section 33-2-34(L)(4)(o). We previously interpreted this statutory mandate in *State v. Morales*, 2002-NMCA-016, ¶ 16, 131 N.M. 530, 39 P.3d 747, *abrogated on other grounds by State v. Frawley*, 2007-NMSC-057, ¶ 36, 143 N.M. 7, 172 P.3d 144. There, we drew three conclusions. First, we determined that, because the EMDA's list of discretionary offenses includes

24

some offenses that always result in death, district courts must consider more than just the resulting harm in determining whether an offense is a serious violent offense. *Id.* ¶ 13. Second, turning to the nature of the offense, we compared the enumerated serious violent offenses with the discretionary offenses and noted that many of the discretionary offenses "are characterized by multiple ways of committing the offense, some intentional and some not, and some utilizing physical force and some not." *Id.* ¶ 15. Based on these distinctions, we concluded that a discretionary crime is a serious violent crime only when the district court finds that the crime was "committed in a physically violent manner either with an intent to do serious harm or with recklessness in the face of knowledge that one's acts are reasonably likely to result in serious harm." *Id.* ¶ 16. We also concluded that, even where support exists in the record that these factors are met, it is up to the district court "in the first instance to make the required findings." *Id.* ¶ 18. Accordingly, in *Morales*, we reversed the district court's serious violent offense designation and remanded for the district court to consider the evidence and make additional findings. *Id.* ¶¶ 18-19.

{33}    The State argues that we should overturn *Morales* and its progeny because those cases are contrary to various rules of statutory construction. However, the State does not explain how the law has developed or the facts have changed since we decided that case, and even its own argument recognizes that our appellate courts have

consistently followed *Morales*. *See Trujillo v. City of Albuquerque*, 1998-NMSC-031, ¶ 34, 125 N.M. 721, 965 P.2d 305 (noting in relevant part that, before overturning precedent, we must consider "whether the principles of law have developed to such an extent as to leave the old rule no more than a remnant of abandoned doctrine" and "whether the facts have changed in the interval from the old rule to reconsideration so as to have robbed the old rule of justification" (internal quotation marks and citation omitted)). We have no basis for overruling *Morales* and decline the State's request to do so.

{34} Since *Morales*, our appellate courts have continued to require that district courts make specific findings regarding *both* the nature of the offense and the resulting harm to support a serious violent offense designation. *See State v. Loretto*, 2006-NMCA-142, ¶ 14, 140 N.M. 705, 147 P.3d 1138. The reason behind the requirement is twofold: "to inform the defendant being sentenced of the factual basis on which his [or her] good time credit is being substantially reduced, and to permit meaningful and effective appellate review of the court's designation." *Id.* ¶ 12. Although these findings do not have to be expressed in the exact language of *Morales*, they must be sufficient to demonstrate the factual basis upon which the district court made its ruling. *State v. Montoya*, 2005-NMCA-078, ¶ 8, 137 N.M. 713, 114 P.3d 393.

26

**{35}** In the present case, the judgment and sentence merely states that, "due to the nature of this offense and the resulting harm, this crime is a serious violent offense." There are no factual findings to support the district court's conclusion. At Defendant's sentencing, the district court stated that its designation of the crimes as serious violent offenses was based on the "nature of the harm" to the two victims. The court then orally proceeded to make factual findings regarding only the resulting harm suffered by B.K. and T.C. However, the district court did not make any findings regarding the nature of the offense. Under *Morales*, the district court's findings were, therefore, legally insufficient.

**{36}** Defendant also contends that the factual findings the district court made pertaining to her behavior and mental state cannot support the conclusion that the offenses are serious violent offenses. Again, *Morales* makes clear that the district court must make findings specifically related to its serious violent offense designation in the first instance. 2002-NMCA-016, ¶ 18. It did not do so. To the extent that the district court considered mitigating factors for sentencing purposes, we note that mitigation and a serious violent offense designation are distinct concepts. The mitigation statute allows a district court to reduce a defendant's *underlying sentence* by considering "any mitigating circumstances surrounding the offense or concerning the offender[.]" NMSA 1978, § 31-18-15.1(A)(1) (2009). In contrast, the section of

the EMDA concerning discretionary offenses allows a district court to exercise discretion regarding how much good time credit a convicted person can get *while serving his or her underlying sentence*, based on the "nature of the offense and the resulting harm." Section 33-2-34(L)(4)(o); *see State v. Andazola*, 2003-NMCA-146, ¶ 21, 134 N.M. 710, 82 P.3d 77 (noting that "the EMDA does not change the maximum penalty for a defendant's crime or impose an additional penalty[,]" but rather "affects the amount of time by which [a] defendant through his own good conduct could decrease his sentence" (internal quotation marks and citation omitted)).

**{37}** We reverse the district court's serious violent offense designation and remand so that the district court can consider the evidence and make the appropriate findings regarding both the nature of Defendant's offenses and the resulting harm to B.K. and T.C., preferably in the written judgment and sentence. We note that in doing so, the court is to follow the direction of *Morales* and its progeny. *See Loretto*, 2006-NMCA-142, ¶¶ 18-19. Specifically, with regard to the nature of the offenses, the district court should enter findings regarding whether the crimes were "committed in a physically violent manner either with an intent to do serious harm or with recklessness in the face of knowledge that one's acts are reasonably likely to result in serious harm." *Morales*, 2002-NMCA-016, ¶ 16. Because we are remanding based on the legal sufficiency of

28

the district court's findings, we do not reach whether the findings the district court made are supported by substantial evidence. *See Scurry*, 2007-NMCA-064, ¶ 4.

**Clerical Error on Judgment and Sentence**

{38}    As a final, undisputed matter, in its brief the State points out a clerical error on Defendant's judgment and sentence: although Defendant was convicted of negligently *permitting* child abuse, the judgment and sentence states she was convicted of negligently *causing* child abuse. We direct the district court on remand to correct this error.

**CONCLUSION**

{39}    We affirm Defendant's conviction for Count I, negligently permitting child abuse resulting in the death of B.K. We reverse the district court's designation of both counts of child abuse in this case as serious violent offenses and remand so the district court can consider the evidence and enter the appropriate factual findings, as well as correct the above mentioned clerical error in the judgment and sentence.

{40}    **IT IS SO ORDERED.**


_____
**LINDA M. VANZI, Judge**

**WE CONCUR:**

_____

**JAMES J. WECHSLER, Judge**


_____

**J. MILES HANISEE, Judge**